# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
July 8, 2014 Session

## SHERRY JUANITA CARTER BERKSHIRE v. EDWIN CARL BERKSHIRE, III

**Appeal from the General Sessions Court for Roane County**
**No. 9099A      Dennis W. Humphrey, Judge**

_____

**No. E2014-00022-COA-R3-CV-FILED-DECEMBER 1, 2014**

_____

The primary issue in this divorce case is whether the trial court erred in failing to find that Sherry Juanita Carter Berkshire (Wife) was entitled to long-term alimony in futuro from Edwin Carl Berkshire, III (Husband). Instead, the court awarded four months of transitional alimony. Wife, who was sixty at the time of the divorce, has numerous health problems and is totally and permanently disabled. Husband, who is twenty years her junior, is able-bodied and works as an automobile mechanic, with an earning capacity of at least $62,000 per year. Taking into account the relevant statutory factors and the totality of the circumstances, we modify the trial court's alimony judgment to make it an alimony in futuro award in the amount of $150 per week. We decline Wife's request to increase the trial court's award of attorney's fees to her, but we do award Wife a reasonable attorney's fee for professional services rendered, plus expenses, in connection with this appeal, in an amount to be determined by the trial court on remand. Further, we modify the trial court's decree requiring Wife to refinance the mortgage on the marital residence. As modified in the ways indicated, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court Affirmed as Modified; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Tom McFarland and Katherine S. Parks, Kingston, Tennessee, for the appellant, Sherry Juanita Carter Berkshire.

Browder G. Williams, Kingston, Tennessee, for the appellee, Edwin Carl Berkshire, III.

**OPINION**

**I.**

The parties were married on August 27, 1999. Wife was forty-six and Husband was twenty-seven. It was Husband's first marriage. Wife had been married twice before and had two daughters from one of those marriages. At the time of her marriage to Husband, Wife had health problems including a diagnosis of multiple sclerosis. The record reflects that the parties discussed Wife's health condition, including her MS, before they married.

Both parties finished high school. Husband attended vocational school and trained for two years to be a diesel mechanic. Husband worked as an automobile mechanic throughout the marriage. Wife did not work outside the home. Her younger daughter, Tara, was approximately sixteen years old at the time of the marriage. Tara lived with the parties over the course of the entire marriage, and was still residing with Wife at the time of the hearing below.

Wife filed for divorce on June 26, 2008. Despite the divorce filing, the parties continued to live together. They attempted to reconcile. Neither party attempted to pursue the case until shortly after Husband moved out of the home on or about May 31, 2011. Wife then filed a motion on June 7, 2011, for default judgment or, in the alternative, for temporary spousal support. The trial court entered an agreed order granting Wife alimony pendente lite in the amount of $600 per week on September 1, 2011, entered nunc pro tunc to July 28, 2011. On May 3, 2013, the trial court entered an order, nunc pro tunc to April 10, 2013, that reduced Husband's alimony pendente lite payments to $400 per week.

The case was tried over three days spanning the period from August 29, 2012, to July 26, 2013. The trial court entered its final judgment on September 5, 2013, granting Wife a divorce on the ground of adultery. The trial court awarded Wife the marital residence, valued at $130,000, and held her responsible for the balance of the mortgage, which was approximately $55,000. The court found Husband's equity interest in the marital residence to be $75,000, and awarded Wife that entire amount as alimony in solido.[1] The division of marital property and debt resulted in a net award to Wife in the amount of $92,339.29 and

---

[1]On appeal, neither party has raised an issue regarding the trial court's (1) finding that Husband was entitled to the $75,000 equity or the court's (2) subsequent finding that Wife was entitled to Husband's $75,000 interest as alimony in solido. Wife argues that the trial court should have held that Husband's equity interest was less than $75,000, but she does not take issue with the trial court's award of the residence and all of the equity therein to her. Because the end result is the same – Wife gets all of the equity in the marital residence – the amount of the equity attributable to Husband is largely immaterial to our analysis of the issues presented on appeal.

to Husband, a net of negative $11,426.98. Husband received personal property classified as his separate property in an amount valued at $25,100.55, and Wife received $15,400 in separate property. Neither party takes issue on appeal with the trial court's property division.

Regarding alimony, the trial court entered a memorandum opinion providing, in pertinent part, the following findings of fact and conclusions of law:

> The Court finds [Wife] is not capable of obtaining employment due to her age and to [her] illnesses.
>
> *       *       *
>
> As to alimony, the Court must consider testimony and argument to the effect that Wife is eligible for social security disability benefits, arguably to receive as much as $1,000 per month, and that all her prescriptions and medical expenses could be paid by TennCare. This divorce was filed June 26, 2008, but she apparently has not applied for such benefits, and possibly intends to seek such after the divorce is concluded. Not taking such available benefits into account would be a disservice to Husband. Certainly, the need for alimony exists. Wife's counsel seeks the Court to base the alimony on Husband's 2011 income of $96,747, arguing he has that capability with his specialized training as an automobile mechanic, and voluntarily reduced his income to avoid a higher alimony award, while Husband's counsel argues the alimony should be based on his current income ranging around $62,000, presenting in Exhibit 15 income for the years from 2006 through 2012, generally a figure between $58,886 to $60,729, with $96,747 for 2011 and $86,840 for 2012. For those years of the highest income, Husband was driving from his residence in Roane County to a car dealership in Cookeville, roughly a 150 mile round trip each day, and such being one of the factors for his terminating that employment and accepting local employment. Though the Court resolves the issue of credibility in favor of Wife, on this issue the Court accepts Husband's position that this was not a voluntary reduction of income to avoid an alimony obligation.

The Court finds this to be a marriage of relatively short term[2] and awards transitional alimony in the amount of $600 per week for August [2013] and then $400 each month until the end of November [2013], thus providing to Wife an opportunity to apply for social security disability benefits and TennCare insurance. Wife is further awarded an attorney's fee of $2,000.

(Footnote added.) Wife timely filed a notice of appeal.

## II.

Wife raises the following issues, as quoted verbatim from her brief:

1. Whether the trial court erred in failing to award permanent alimony to [her].

2. Whether the lower court erred by not awarding [Wife] her reasonable attorney's fees.

3. Whether this Court should award [Wife] her attorney's fees on appeal.

4. Whether the trial court erred in ordering [Wife] to be responsible for indebtedness of [the] marital home and to refinance the mortgage in her own name when the proof clearly showed it was an impossibility.

## III.

The Supreme Court has provided the principles that guide our review of a trial court's alimony decision:

For well over a century, Tennessee law has recognized that trial courts should be accorded wide discretion in determining matters of spousal support. This well-established principle still holds true today, with this Court repeatedly and recently observing that trial courts have broad discretion to determine

_____

[2]Given the current culture, this Court does not believe a fourteen-year marriage should be considered "relatively short term."

whether spousal support is needed and, if so, the nature, amount, and duration of the award.

Equally well-established is the proposition that a trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision.

*Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011) (internal citations and footnote omitted).

Our review of this non-jury case is de novo upon the record of the proceedings below with a presumption of correctness as to the trial court's factual findings, a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d). We review the trial court's conclusions of law de novo with no presumption of correctness. *Oakes v. Oakes*, 235 S.W.3d 152, 156 (Tenn. Ct. App. 2007).

IV.

Wife argues that the trial court should have awarded her long-term alimony. As the

Supreme Court has recently observed:

Tennessee recognizes four distinct types of spousal support: (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1) (2010 & Supp.2012). Alimony in futuro, a form of long-term support, is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. *Gonsewski*, 350 S.W.3d at 107. Alimony in solido, another form of long-term support, is typically awarded to adjust the distribution of the marital estate and, as such, is generally not modifiable and does not terminate upon death or remarriage. *Id.* at 108. By contrast, rehabilitative alimony is short-term support that enables a disadvantaged spouse to obtain education or training and become self-reliant following a divorce. *Id.*

Where economic rehabilitation is unnecessary, transitional alimony may be awarded. Transitional alimony assists the disadvantaged spouse with the "transition to the status of a single person." *Id.* at 109 (internal quotation marks omitted). Rehabilitative alimony "is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency," whereas "transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." *Id.* Consequently, transitional alimony has been described as a form of short-term "bridge-the-gap" support designed to "smooth the transition of a spouse from married to single life."

Transitional alimony is payable for a definite period of time and may be modified only if: (1) the parties agree that it may be modified; (2) the court provides for modification in the divorce decree, decree of legal separation, or order of protection; or (3) the recipient spouse resides with a third person following the divorce. Tenn. Code Ann. § 36-5-121(g)(2).

Tennessee statutes concerning spousal support reflect a

legislative preference favoring rehabilitative or transitional alimony rather than alimony in futuro or in solido. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); ***Gonsewski***, 350 S.W.3d at 109. . . . Decisions regarding the type, length, and amount of alimony turn upon the unique facts of each case and careful consideration of many factors, with two of the most important factors being the disadvantaged spouse's need and the obligor spouse's ability to pay. ***Id.*** at 109-10.

*Mayfield v. Mayfield*, 395 S.W.3d 108, 115-16 (Tenn. 2012) (internal citation omitted; emphasis in original).

Tennessee courts making an alimony decision must consider the following statutory factors to the extent that they are implicated by the evidence:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
>
> (3) The duration of the marriage;
>
> (4) The age and mental condition of each party;
>
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
>
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
>
> (7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (2014).

In this case, the reality is simply this: Wife is the economically disadvantaged spouse; she cannot achieve self-sufficiency; and she cannot be rehabilitated. All of this is not in dispute. Wife presented the deposition testimony of her treating physician, Dr. Shere Conway, who stated that Wife suffers from MS, a seizure disorder history, fibromyalgia, depression, hypertension, and "significant arthritis." Dr. Conway opined that Wife is totally and permanently disabled from working due to her physical condition. Dr. Conway further testified that in her opinion, Wife's medical expenses will likely either stay constant or increase for the foreseeable future. Husband did not present any proof disputing or contravening Dr. Conway's testimony. Wife's earning capacity is clearly zero.

Wife, however, does have access to sources of money for support. She testified that, before marrying Husband, she had previously qualified for Social Security disability payments. She was not entitled to these payments after the marriage. The trial court tried diligently to determine how much Wife would be entitled to receive by the way of Social Security disability benefits, but Wife showed little effort in ascertaining and presenting that information. This was largely because of her insistence that she would not qualify until after the divorce was final. Wife did testify that she called the Social Security Administration, and they told her she "would probably get around a little over a thousand dollars." Wife also testified that she had been on TennCare before, which covered all of her medical expenses.

The evidence preponderates in favor of a finding that Wife will be able to draw Social Security disability benefits somewhere in the range of $1,000 to $1,100 per month, and that her medical expenses will be mostly, if not entirely, covered by TennCare.

As previously noted, Wife's daughter, Tara, has lived with her during all of Tara's life. Tara, who was about twenty-nine years old at the time of her testimony below, has a bachelor's degree in accounting. She was working full-time and testified that "after taxes I pull in a little over a thousand dollars every two weeks." Both Wife and Tara testified that Tara helped around the house by doing chores, running errands, and contributing to the living expenses when she was able to do so. Tara's reasonable contribution is a factor to be considered in setting alimony. Tenn. Code Ann. § 36-5-121(i)(1) (directing court to consider "financial resources of each party, including income from . . . all other sources"). Moreover, as Husband points out, Tenn Code Ann. § 36-5-121(f)(2)(B)[3] provides as follows:

> (B) In all cases where a person is receiving alimony in futuro and the alimony recipient lives with a third person, a rebuttable presumption is raised that:
>
> (i) The third person is contributing to the support of the alimony recipient and the alimony recipient does not need the amount of support previously awarded, and the court should suspend all or part of the alimony obligation of the former spouse; or
>
> (ii) The third person is receiving support from the alimony recipient and the alimony recipient does not need the amount of alimony previously awarded and the court should suspend all or part of the alimony obligation of the former spouse.

Consequently, we consider Tara's net monthly income of approximately $2,167 as a factor pertinent to the "alimony" analysis. Tara also testified that her monthly expenses included a student loan payment of $440 and a car payment of about $300.

Wife filed several affidavits of her monthly income and expenses. Wife's testimony establishes her reasonable expenses to be approximately $3,500 per month.[4] Taking into

---

[3]The Court recognizes that this statute addresses a situation where an obligor is seeking to terminate or modify an alimony obligation. While this situation is not before us, we find the public policy expressed in the statute to be relevant to Tara's living with Wife and her contribution to the household expenses.

[4]Wife's last affidavit filed with the trial court claims total monthly expenses in excess of $3,500, but
(continued...)

consideration Wife's potential sources of money, the evidence clearly preponderates in favor of the trial court's conclusion that "[c]ertainly, the need for alimony exists."

Husband worked as an automobile mechanic during the marriage and after the separation. He submitted proof establishing his gross income for the following years: 2006 ($58,886); 2007 ($62,961); 2008 ($58,061); 2009 ($61,730); 2010 ($60,422); 2011 ($96,747); and 2012 ($86,841). Husband explained the reasons for his substantially increased income in 2011 and 2012 as follows. Husband was romantically involved with a co-worker in 2011. According to Husband, the relationship began after the parties in this case separated at the end of May 2011; Wife alleged that Husband was having an affair with the co-worker before this. Husband's girlfriend was responsible for assigning work to the mechanics at the car dealership. Husband testified that in 2011, he was able to increase his income because his girlfriend funneled a lot of work to him, and because he worked thirteen to fifteen hours a day. When the employer found out about Husband's relationship, the girlfriend was fired and, according to Husband's testimony, they "starved him out" by sending him little to no work.

Husband was recruited by a car dealership in Cookeville. The dealership's general manager testified that he wanted to grow the service department, so he offered Husband a lucrative contract guaranteeing him a gross of $3,600 every two weeks, and further stated as follows:

> I wanted a great tech to come up there to help me to get it to grow and so I g[a]ve him a guarantee, a big guarantee as a matter of fact, and which I went with for roughly right at a year, but it just didn't grow as fast as I thought it would have and I just couldn't afford to do it anymore.
>
> *      *      *
>
> Q: [W]as there anything that [Husband] did to cause his hours to get cut and his service guarantee to get cut at your place of business?
>
> A: No, sir.

---

[4](...continued)
we agree with Husband's argument that some of the claimed expenses appear to be overinflated to a certain degree. We also note that some of the expenses do not involve necessities and may well be subject to reduction to a lesser amount.

-10-

Q: Did [Husband] work hard and try to do the best he could from your observations of seeing him there?

A: Yes, sir.

Q: Could your business continue to afford to provide him with a job where every two weeks he was guaranteed thirty-six hundred dollars?

A: No, sir. I mean, that's the whole purpose of what happened. I hated to cut it back to the fifty hours. He's a good employee or I wouldn't have offered him that to start with. So it didn't grow as fast as I assumed and it's just a still slower process.

After Husband's income was significantly cut, Husband quit and began working at Ted Russell Nissan in Knoxville. He submitted proof showing that his gross income in 2013 extrapolated to about $46,210 yearly, or $3,851 a month.

Wife argues that Husband was voluntarily underemployed and that, for alimony purposes, his income should be set around $96,747, his highest earning year. Husband argues that his income should be set at approximately $46,210, the amount that he alleges he was earning at the time of the divorce. The trial court found Husband was not voluntarily underemployed. We agree. Husband provided at least three objectively reasonable reasons why he quit his job in Cookeville: (1) they cut his hours and earnings significantly, breaching his employment agreement; (2) he had to commute 140 miles round-trip from Roane County to Cookeville and back each workday; and (3) the Cookeville job required him to work on unfamiliar Hyundai cars – vehicles on which he did not enjoy working. Although the trial court did not explicitly make a finding of Husband's earning capacity, its memorandum opinion, quoted above, appears to implicitly find it to be $62,000 a year, or $5,167 per month. The evidence does not preponderate against this finding. Based on Husband's past work history, the amounts he earned in recent years, and the testimony of his former employer that he is a very good mechanic, the evidence preponderates that he is capable of earning $62,000 per year.

The parties disagreed on the amount of Wife's tangible and intangible contributions to the marriage. When they got married, Wife owned the 2.2 acres and a double-wide manufactured home that was to become the marital residence. During the marriage, Wife received a $325,000 settlement from a wrongful death claim arising from her second husband's death. Wife treated this money as separate property and maintained control over it. She gave each of her daughters a substantial portion, reckoning that they were entitled to

it as compensation for the wrongful death of their father. The parties in this case bought a new double-wide manufactured home and Wife paid $26,000 as a down payment, $6,000 of which came from the trade-in value of her old home. Wife testified that she used the settlement money to furnish the new house, for various household expenses, for Christmas presents, and the like. It was not disputed that the settlement money had all been spent by the time of the divorce, except for possibly $5,000 that Wife had given to her daughter Tara.

Husband testified that the parties frequently fought over, in his words, Wife "being lazy and not cleaning and not cooking, not taking care of the house, sit there all day long, didn't do anything while I was out working. She just sat there and watched TV, slept." Wife recognized that she "didn't keep the house like he expected me to, but I wasn't able" because of her illnesses. Wife testified without contradiction that Husband knew about her diagnosis of MS and her physical infirmities before they married, and that Husband promised her he would take care of her.

We hold that the evidence preponderates against the trial court's award of four months of transitional alimony. Considering all of the pertinent statutory factors and the totality of the circumstances, we modify Wife's award to an amount of $150 per week as alimony in futuro, payable until Wife dies or remarries. While Wife will likely be entitled to social security disability benefits and TennCare, nevertheless, she is clearly in need of additional support, and Husband has the ability to pay this amount without undue financial hardship. This alimony in futuro is in addition to the trial court's short-term alimony award for the months of August through November of 2013. Our $150 per week alimony in futuro award is prospective in nature only. It will commence upon the date that this opinion is released.

The trial court awarded Wife attorney's fees in the amount of $2,000. Wife argues that the trial court should have awarded her a larger amount. In *Gonsewski*, the High Court stated:

> It is well-settled that an award of attorney's fees in a divorce case constitutes alimony in solido. *See* Tenn.Code Ann. § 36-5-121(h)(1) ("alimony in solido may include attorney fees, where appropriate"); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). The decision whether to award attorney's fees is within the sound discretion of the trial court. *Crabtree*, 16 S.W.3d at 361; *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). As with any alimony award, in deciding whether to award attorney's fees as alimony in solido, the trial court should consider the factors enumerated in Tennessee Code Annotated section 36-5-121(i). A spouse with adequate

property and income is not entitled to an award of alimony to pay attorney's fees and expenses. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997). Such awards are appropriate only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses, *see Houghland v. Houghland*, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), or the spouse would be required to deplete his or her resources in order to pay them, *see Harwell v. Harwell*, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980). Thus, where the spouse seeking such an award has demonstrated that he or she is financially unable to procure counsel, and where the other spouse has the ability to pay, the court may properly grant an award of attorney's fees as alimony. *See id.* at 185.

350 S.W.3d at 113.

We find that the evidence does not preponderate against the $2,000 award of attorney's fees. The award was within the trial court's sound discretion, and we decline to disturb it on appeal. In making this ruling, we bear in mind that Wife was awarded a significantly higher portion of the marital estate – property valued at $92,339.29 in net amount, while Husband received debts exceeding marital assets resulting in a net of negative $11,426.98.

We further find that Wife is entitled to an award of a reasonable attorney's fee on appeal. Looking at Wife's income going forward, she has demonstrated that she lacks sufficient funds to pay her appellate expenses and would be required to significantly deplete her relatively-meager resources in order to pay them. On remand, the trial court is directed to hold a hearing and determine the amount that Wife is entitled to receive by way of reasonable attorney's fees and expenses, related to professional services rendered to Wife on appeal.

Finally, Wife argues that the trial court erred by ordering her "to refinance the mortgage in her own name and . . . hold [Husband] harmless therefrom." In her brief, Wife asserts that "[i]t would be impossible for her to refinance this mortgage given the fact that no lender would loan money to someone in her current physical and financial position." We modify this decree of the trial court to provide that Wife shall apply for, and make reasonable efforts leading to, the possible refinancing of the mortgage on the residential property in her sole name.

V.

The trial court's judgment is affirmed as modified. The case is remanded to the trial court for a determination of a reasonable attorney's fee and expenses in connection with professional services rendered on appeal. Costs on appeal are assessed to the appellee, Edwin Carl Berkshire, III.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE